Filed 4/6/26  In re D.E. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.E., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.E.,<br><br>Defendant and Appellant. | C102839<br><br>(Super. Ct. No. JJC-JV-DE-2017-0001829) |

On August 26, 2022, minor D.E. was shot in the buttock by Kenneth H.  The following morning, minor, along with his uncle and two friends, approached Kenneth's son, Sauci Haywood, about the shooting.  An altercation ensued during which minor shot Sauci in the back.

On the prosecutor's petition, the juvenile court held a transfer hearing.  After evaluating the transfer criteria under Welfare and Institutions Code section 707 (statutory

1

section references that follow are to the Welfare and Institutions Code unless otherwise stated), the court found by clear and convincing evidence that minor was not amenable to rehabilitation under the jurisdiction of the juvenile court and ordered minor to be transferred to criminal court.

Minor appeals from this decision and raises two challenges. First, he contends that the juvenile court's amenability finding was not supported by substantial evidence. Second, minor claims that the trial court abused its discretion by admitting the opinions and transfer report of retained psychologist Dr. Alison Vargas. We affirm the juvenile court's order.

FACTS AND HISTORY OF THE PROCEEDINGS

Sauci's Murder

Minor lived with his grandmother until she passed away when minor was 12 years old. His living situation afterwards is difficult to track, but it appears he lived with his mother for a period of time, an aunt and uncle, and an abusive woman name Lawanda; minor also moved around through several homes of either acquaintances and/or family members, and he experienced bouts of voluntary homelessness. When he was 17, minor's uncle, Bryon S., became his guardian. Minor's mother abused drugs and had a criminal history; she came into his life intermittently. There is no information about minor's father.

Bryon and minor "claimed" the 6200 Block of Porterfield Court in Stockton, though Bryon denied being in a gang. On the evening of August 26, 2022, Bryon and minor were walking together in Porterfield Court when minor was shot in the buttock by Kenneth. Bryon shot at Kenneth in return.

The next day, minor and Bryon returned to Porterfield Court with friends Dee B. and David J. Minor, David, and Dee saw Sauci, Kenneth's son, drive into the court. The group confronted Sauci about his father shooting minor. Minor, David, Bryon and Dee

2

surrounded Sauci; David punched Sauci and the two began to fight. During the fight, minor shot Sauci in the back with a gun that he either brought to the confrontation himself or that Bryon handed to him during the altercation.

Sauci died from his injuries.

The day after the murder, minor texted his friend Cameron J. about the shootings. Cameron asked minor if he knew who shot him, to which minor responded, "[Y]eah. I already did what I had to do."

Bryon and minor left for Las Vegas after the murder.

Minor carried guns and bought and sold guns and ammunition in 2022 and 2023. He was eventually arrested and charged with carrying a concealed firearm in a vehicle (Pen. Code, § 25400, subd. (a)(1)) in March 2023. Minor admitted to the charge and was placed on an ankle monitor. Photographs on social media showed minor holding and pointing a firearm towards his ankle monitor and standing near large bags of marijuana.

Minor was eventually arrested in Nevada for Sauci's murder and placed into juvenile hall on January 19, 2024.

Legal Proceedings

On January 2, 2024, a petition under section 602 was filed alleging minor murdered Sauci and intentionally and personally discharged a firearm and proximately caused great bodily injury. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).) On the prosecutor's petition, the juvenile court held a transfer hearing under section 707.

At the hearing, incident reports from juvenile hall were admitted and revealed that minor suffered approximately 30 "disobedience[s]" between January and August 2024. The disobedient behavior included failing to follow rules; talking back to, manipulating, intimidating, and threatening staff; "sexually acting out"; arguing with, harming, and threatening other juveniles; disrupting class and programs; and fighting.

Dr. Vargas, a licensed clinical psychologist, testified at the transfer hearing.  She was retained by the prosecutor to write a report regarding minor's transfer from juvenile to criminal court.  The juvenile court recognized Dr. Vargas as an expert in psychology.

Dr. Vargas reviewed records related to the murder charge, minor's educational and mental health treatment records, and his disciplinary history in juvenile hall.  She also researched recidivism in teenage offenders.  She noted that minor has no intellectual disabilities or special education.

With this information, Dr. Vargas analyzed the criterion under section 707.  Based on the circumstances of the murder; minor's ongoing criminal history including drugs, violence, and illegal gun possession; as well as minor's failure to benefit from the disciplinary consequences and available treatment in juvenile hall, Dr. Vargas opined that minor would not rehabilitate before he aged out of the juvenile court system in 2030 at age 25.

Minor called several witnesses to speak on his behalf.  One of minor's juvenile hall teachers testified that he had "no problems" with minor in class and that he completed all his schoolwork.  Minor's older sister also testified and described her childhood with minor including their time living with their grandmother, minor's various homes throughout the years, and the abuse from Lawanda.  She did not remember minor as a "bad kid" or "getting in trouble."

In independently evaluating each of the five criteria under section 707 regarding transfer, the juvenile court considered testimony, including expert testimony from Dr. Vargas, and evidence regarding minor's childhood, schooling, mental health, criminal history, and discipline in juvenile hall.  The court found that three criteria weighed in favor of transfer, including criminal sophistication, ability to rehabilitate while in the juvenile court's jurisdiction, and gravity of the offense.   The juvenile court found two criteria weighed against transfer, including previous delinquent history and previous attempts by the juvenile court to rehabilitate.

4

In considering these criteria collectively, the juvenile court found by clear and convincing evidence that minor was "not amenable to the care, treatment, and training programs available through the juvenile court system under the statutory criteria." Minor was ordered to be transferred to the jurisdiction of the criminal court.

DISCUSSION

I

*Substantial Evidence Supports Transfer to Criminal Court*

Minor contends that the evidence presented at the hearing was insufficient to establish criminal sophistication, inability to rehabilitate before expiration of the juvenile court's jurisdiction, and the gravity of the offense under section 707. Minor requests reversal of the transfer order with instructions on remand to enter a new order denying the request for transfer. Alternatively, minor asks for remand for a new amenability hearing.

<u>Legal</u> <u>Standards</u>

Section 707 provides the only method for the prosecution to try a juvenile offender in criminal court. To transfer a minor under this section, the prosecution must show "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) The statute sets out five criteria that juvenile courts must consider in making this determination. These are (1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) "[t]he

5

circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

The juvenile court does not consider these criteria in isolation. Instead, the statute "requires the juvenile court to consider all five [criteria] together in determining whether the minor is amenable to rehabilitation." (*In re E.P.* (2023) 89 Cal.App.5th 409, 417.) Nor does the statute dictate the importance of one criterion over another: "[T]he court has the discretion to conclude that one or more of the five [criteria] predominate so as to determine the result, even though some or all of the other [criteria] might point to a different result." (*Ibid.*)

Additionally, each of the five criteria include a list of factors the juvenile court must consider when evaluating amenability and the court is statutorily required to afford weight to the listed factors. (§ 707, subd. (a)(3) (A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

### Standard of Review

We review for substantial evidence the juvenile court's factual findings under section 707, subdivision (a) (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 165), mindful "of [the] high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, fn. omitted.) But "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id*. at p. 1009.) We "do[ ] not reweigh the evidence itself." (*Id*. at p. 1008.) Rather, we must "view the record in the light most favorable to the judgment below," "indulge reasonable inferences that the trier of fact might have drawn from the evidence," "accept the fact finder's resolution of conflicting evidence," and we "may not insert [our] own views regarding the credibility of witnesses." (*Ibid*.)

In this context, the criteria used to determine fitness are based on the premise that the minor did, in fact, commit the offense. (*People v. Superior Court* (*Rodrigo O.*) (1994) 22 Cal.App.4th 1297, 1303-1304 [minor's evidence that he was elsewhere at the time of the crimes was not relevant to the determination of his fitness for treatment under the juvenile court law].)

Criminal Sophistication

Pursuant to section 707, subdivision (a)(3)(A)(i), the juvenile court is to consider the minor's criminal sophistication. "When evaluating [this] criterion . . . , the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).) The court found this factor weighed in favor of transfer based on the manner in which the shooting occurred as well as minor's decisions to flee and continue committing crimes after the murder.

Substantial evidence supports the court's findings on this criterion. Minor and his uncle and friends approached Sauci the morning after Sauci's father shot minor in the buttock. The group surrounded Sauci and confronted him about the shooting. David lured Sauci into a physical fight. During the altercation, minor shot Sauci in the back with a gun he either pulled out himself or was given by Bryon. Minor proudly texted his friend afterwards that he "did what [he] had to do" in response to being shot by Kenneth.

Shortly after the murder, minor fled to Las Vegas. After the murder, but before he was arrested, minor admitted to carrying a concealed firearm in a vehicle. He was placed on an ankle monitor and then mocked the justice system by posting photographs on social media where he posed with marijuana and pointed a gun at his ankle monitor. Minor was also known to sell firearms and ammunition between the time of the murder and his arrest.

A reasonable trier of fact could have regarded these facts as clear and convincing evidence of criminal sophistication.

Rehabilitation

The juvenile court must also consider "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) In evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).) The court also found that this factor weighed in favor of transfer based on minor's exhibited defiance and "total disregard for . . . authority" while in juvenile hall as well as his refusal to change.

Substantial evidence supports the trial court's finding on this criteria. Minor was 19 years old at the time of the hearing and had six years from that point to rehabilitate before turning 25 and falling out of the juvenile court's jurisdiction. (§ 607, subd. (c).) Although minor had access to programs, school, and therapy in juvenile hall, he did not take any meaningful advantage of these opportunities. Instead, minor spent his time failing to follow rules; talking back to, manipulating, intimidating, and threatening staff; "sexually acting out"; arguing with, harming, and threatening other juveniles; disrupting class and programs; and fighting. As the juvenile court noted from Dr. Vargas's testimony, there was "no demonstrative change in [minor's behavior] and no lessening of disciplinary reports" despite consequences for his actions. Although minor had an

8

abundance of opportunities, and no intellectual deficiencies, he repeatedly chose not to improve his behavior.

The juvenile court could thus reasonably infer from minor's continued poor behavior in juvenile hall that effective rehabilitation required more time than juvenile jurisdictional limits permitted.

### Circumstances and Gravity of the Offense

The juvenile court also considers "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(E)(i).) In weighing these criteria, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).) The court also found this criterion weighed in favor of transfer, noting that murder is "as serious as it can get," especially given that minor shot Sauci from behind while he was fighting David.

Substantial evidence also supports this finding. Minor and his friends and uncle approached and surrounded Sauci, outnumbering him four to one. While Sauci was fighting David, minor shot Sauci in the back. Minor's actions, taken in revenge for being shot by Kenneth the night before, reflect deeply troubling and serious circumstances of the offense.

II

*Testimony of Dr. Vargas*

Minor claims that the juvenile court abused its discretion and violated his constitutional right to due process and a fair hearing by permitting Dr. Vargas to testify and by admitting and considering her transfer report. According to minor, Dr. Vargas's testimony and report were "categorically" inadmissible because they were founded upon

9

actions taken by Dr. Vargas that violated the American Psychological Association's Ethics Code (APA Ethics Code). Specifically, minor contends that Dr. Vargas violated the APA Ethics Code by giving her opinions without meeting with minor first (APA Ethics Code, § 9.01(b)); failing to seek minor's consent before giving her opinions and writing her report (APA Ethics Code, § 3.10(c)); and failing to take reasonable steps to avoid harming minor (APA Ethics Code, § 3.04(a)).

Counsel raised and lost the same argument in *In re: S.F.* (*In re S.F.* (March 20, 2025, C099783) [nonpub. opn.] (*S.F.*).) As we explained, "[W]e are not tasked with reviewing a violation of professional ethics. Our job is to determine the legal issue of whether Dr. Urquiza's testimony is admissible. And nowhere in the Evidence Code, or any other applicable legal authority provided by minor, requires a psychologist to obtain consent from the subject of expert testimony before delivering an opinion in court, nor that this opinion cannot be that a minor is not amenable to rehabilitation. We therefore conclude the juvenile court did not abuse its discretion by permitting Dr. Urquiza to testify on the matters that he did." (*Ibid.*)

Counsel's failure to acknowledge this court's prior decision on the same issue, or to make any effort to customize his argument to persuade us to come to a different result, is inappropriate – at least. The reasoning in *S.F.* is sound, and counsel does not change our minds by simply repeating the same argument.

Consequently, we reach the same conclusion on minor's challenge to the admission of Dr. Vargas's testimony and report as we did in *S.F.* Minor's repeated challenges to expert evidence based upon the APA Ethics Code does not bear on this appeal and minor has, once again, failed to point to applicable legal authority to demonstrate that the juvenile court erred in admitting Dr. Vargas's testimony and report.

10

## Disposition

The juvenile court's order transferring minor to a court of criminal jurisdiction is affirmed.

_____
HULL, J.

We concur:

_____
EARL, P. J.

_____
MESIWALA, J.